**ASH CREEK MINING COMPANY, an Oklahoma Corporation, Plaintiff–Appellant,**

v.

**Manuel LUJAN, in his official capacity as Secretary of the United States Department of the Interior; and the United States Department of the Interior, Laurance S. Rockefeller, an individual; the Sloan–Kettering Institute for Cancer Research, a non-profit New York Corporation; Consolidation Coal Company, a Delaware Corporation; and Reserve Coal Properties Company, a Delaware Corporation, Defendants–Appellees.**

No. 91–8014.

United States Court of Appeals, Tenth Circuit.

July 7, 1992.

Ben Aufill, of Burleson, Pate & Gibson, Dallas, Tex. (Brent R. Kunz, of Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, Wyo., with him on the brief), for plaintiff-appellant.

Ellen J. Durkee, Attorney, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C. (Barry M. Hartman, Acting Asst. Atty. Gen., Washington, D.C., Richard A. Stacy, U.S. Atty., Carol A. Statkus and Maynard Grant, Asst. U.S. Attys., Cheyenne, Wyo., Fred R. Wagner and Martin W. Matzen, Attorneys, Environment & Natural Resources Div., U.S. Dept. of Justice, Mark D. Etchart, Office of the Solicitor, Dept. of the Interior, Washington, D.C., Lyle K. Rising, Office of the Regional Solicitor, Dept. of the Interior, Denver, Colo., with her on the brief), for defendants-appellees Manuel Lujan, in his official capacity as Secretary of U.S. Dept. of the Interior, and U.S. Dept. of the Interior.

Richard M. Davis, Jr. (Kate M. Fox with him on the brief), of Burgess, Davis, Carmichael & Cannon, Sheridan, Wyoming, for defendant-appellee Reserve Coal Properties Co.

Gaines Gwathmey, III, of Paul, Weiss, Rifkind, Wharton & Garrison, N.Y. (Steven B. Rosenfeld and Daniel G. Cort, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Marcelle Shoop and Jack D. Palma, II, of Holland & Hart, Cheyenne, Wyo., with him on the brief), for defendant-appellee The Sloan–Kettering Institute for Cancer Research.

Henry L. Diamond and Christopher W. Mahoney, of Beveridge & Diamond, Washington, D.C., and Carl L. Lathrop and J. Kent Rutledge, of Lathrop & Rutledge,

Cheyenne, Wyo., filed a brief for defendant-appellee Laurance S. Rockefeller.

Before: SEYMOUR, SETH and ALDISERT,* Circuit Judges.

ALDISERT, Senior Circuit Judge.

We meet again a controversy between the plaintiff-appellant, Ash Creek Mining Company, and the Secretary of the Interior over certain federally owned coal located in Sheridan County, Wyoming. In *Ash Creek Mining Co. v. Lujan*, 934 F.2d 240 (10th Cir.1991) (*Ash Creek I*), Ash Creek challenged the Secretary of the Interior's decision to set aside the Ash Creek Coal Leasing Tract in Sheridan County from competitive coal leasing and to designate it for exchange for the Whitney Benefits Tract. We held that Ash Creek's claim was unripe for decision because Ash Creek had failed to show that the Department's proposed exchange for the Whitney Benefits Tract constituted "final agency action" under the Administrative Procedure Act, 5 U.S.C. § 704. *Id.* at 243–44. We did not reach the question of standing.

Following the original appeal, the Secretary of the Interior did complete an exchange of 2,560 acres of coal in the Ash Creek and Youngs Creek Coal Leasing Tracts for the JY Ranch conservation easement in the Grand Teton National Park. In *Ash Creek I,* Ash Creek Mining Company had opposed the possible exchange of the coal in the Ash Creek tract. This time it opposed the completed exchange, but the district court dismissed its complaint for lack of standing. This appeal by Ash Creek squarely presents the question whether Ash Creek has Article III standing to challenge the completed exchange. We hold that it does not have standing and affirm the judgment of the district court.

The district court had subject matter jurisdiction based on 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. The appeal was timely filed under Rule 4(a), Fed.R.App.P.

* Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by

designation.

We review *de novo* the grant of a motion to dismiss for lack of standing. *Riggs v. City of Albuquerque*, 916 F.2d 582, 584 (10th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991). A motion to dismiss is properly granted when it appears beyond doubt that the plaintiff could prove no set of facts entitling it to relief. *Huxall v. First State Bank*, 842 F.2d 249, 251 (10th Cir.1988). We must construe the complaint in favor of the plaintiff, accepting as true all material allegations. *American Mining Congress v. Thomas*, 772 F.2d 640, 650 (10th Cir. 1985) (citing *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 718 (1986).

I.

The facts are undisputed. On August 9, 1985, Laurance S. Rockefeller agreed to exchange a conservation easement on his ranch, known as the JY Ranch, located within the Grand Teton National Park in Northeast Wyoming, for certain Sheridan County coal owned by the Department of the Interior. In December 1987, Rockefeller donated the JY Ranch conservation easement to The Sloan–Kettering Institute for Cancer Research, a non-profit organization, which then became the exchange proponent.

The Bureau of Land Management (hereinafter "the Bureau") subsequently prepared an environmental assessment of the proposed exchange. The Bureau concluded that the exchange presented no significant environmental impact and determined that an environmental impact statement was not necessary. On November 3, 1989, the Bureau published a Notice of Realty Action in the *Federal Register* outlining the proposed exchange of 2,560 acres of federal coal located in the Ash Creek and Youngs Creek Coal Leasing Tracts in Sheridan County, Wyoming, for 1106.49 acres of the JY Ranch conservation easement. The No-

tice provided for public comment/protest within 45 days.

Ash Creek Mining Company and others filed oral and written protests to the exchange. Ash Creek, a wholly owned subsidiary of the Public Service Company of Oklahoma (PSO), holds an operating permit for its PSO No. 1 Mine on a 160–acre fee coal tract adjacent to portions of the federal coal offered for exchange. Approximately 70 acres of the exchanged coal underlie a portion of the surface land owned by Ash Creek. Ash Creek has invested $14.5 million in the PSO No. 1 Mine and adjoining acreage.

On May 10, 1990, Sloan–Kettering conveyed the conservation easement in the JY Ranch to the United States by warranty deed. On May 11, 1990, the Assistant Secretary of the Interior for Land and Minerals Management dismissed the protests filed in response to the Notice. On the same date, the Bureau of Land Management accepted title to the conservation easement on behalf of the National Park Service and issued Sloan–Kettering a patent granting title to the coal. Sloan–Kettering subsequently sold the coal rights to Reserve Coal Properties Company.

## II.

On August 21, 1990, Ash Creek filed a complaint in federal district court against the Secretary of the Interior, the Department of the Interior, Rockefeller, Sloan–Kettering, Consolidation Coal Company and Reserve Coal Properties seeking judicial review of the Secretary's action and requesting that the JY Ranch exchange be voided. The complaint declared that Ash Creek opposed the exchange primarily because it wanted to acquire the rights to the coal through the Secretary's competitive coal leasing program:

35. ACMC [Ash Creek Mining Company] has invested $14.5 million in the PSO Mine No. 1 and adjoining acreage. On January 21, 1976, ACMC secured an operating permit for its PSO Mine No. 1 from the Wyoming Department of Environmental Quality, Land Quality Division, on a 160 acre fee coal tract adjacent

to portions of the federal coal that was exchanged to the Defendant Sloan–Kettering. Approximately seventy acres of the coal exchanged underlie a portion of ACMC's permitted mine site on which are located a spoil pile and a major water-control facility which served the PSO No. 1 Mine. *It is necessary to acquire the federal coal to maintain the viability of PSO No. 1 Mine. It is necessary to acquire the federal coal to expand the existing mine and fulfill the original purpose to serve the operating utilities of the Central and South West System. It is necessary to expand onto the federal coal so as to earn a return on the original investment in the PSO No. 1 Mine and the adjoining acreage.*

36. Beginning in 1976, ACMC and certain of its affiliated companies have submitted expressions of competitive leasing interest for the federal coal that is adjacent to its permitted mine. ACMC's efforts to have the federal coal disposed of in a competitive lease sale have not been successful.

37. Disposing of the federal coal by exchanges instead of by competitive leasing deprives ACMC the opportunity of providing fuel for the electrical needs of its customers served by the Central and South West System. ACMC is specifically injured by the Defendants actions. Such actions have destroyed the value of the investment made to acquire needed fuel for electric power generation made by ACMC and its parent company, Public Service Company of Oklahoma, in the PSO No. 1 Mine and adjoining acreage. By depriving ACMC and its affiliated companies from competitively bidding for coal needed for electric power generation, ACMC must seek less favorable, more costly long term fuel supplies to serve the needs of over 1,530,618 electric customers.

38. The exchanged coal lies beneath the SW¼ of Section 22 of ACMC's permitted minesite. The private ownership of the coal estate underlying the SW¼ of Section 22 diminishes the value of ACMC's investment by placing signifi-

cant facilities necessary and essential to environmental protection, mining operation, and permit compliance at the PSO Mine No. 1 at the whelm of the development schedule of Defendants Consolidation Coal Company and Reserve Coal Properties Company. Hundreds of thousands of cubic yards of overburden that is stockpiled in the ACMC's PSO No. 1 Mine overlie the federal coal that is the subject of the JY Exchange. The mining of the exchanged coal under these surface facilities will adversely affect the operations of ACMC.

39. By denying ACMC the opportunity to competitively bid on approximately 375 acres within the Ash Creek Coal Leasing Tract which has been exchanged and transferred by and among Defendants, the actions of the parties involved in the exchange have:

(a) destroyed ACMC's opportunity to recover the $14.5 million investment made in the permitted mine site and adjoining acreage; and

(b) increased the cost of electricity to over 1,530,618 electric customers by denying to such customers the plaintiff's opportunity to obtain a long term, low cost, low sulfur coal supply to generate electric power.

Complaint at 12–14 (emphasis added).

Ash Creek alleged that the exchange violated the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701, et seq., the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., the Mineral Leasing Act (MLA), 30 U.S.C. § 181, et seq., and the Administrative Procedure Act (APA), 5 U.S.C. § 551, et seq. It asked the court for an order setting aside all of the Secretary's actions and voiding the federal coal patent to Sloan–Kettering and subsequent sale to Reserve Coal Properties. The State of Wyoming also filed a complaint seeking to set aside the exchange, as more fully discussed in the companion case filed this date, Wyoming ex rel. Sullivan, v. Lujan, 969 F.2d 877 (10th Cir.1992).

### III.

All defendants moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On March 8, 1991, the district court granted their motions, holding that Ash Creek lacked Article III standing to challenge the JY Ranch exchange. The court determined that Ash Creek did not satisfy the requirements for constitutional standing because its alleged injury could not be redressed by voiding the exchange. The court explained:

Ultimately, what plaintiff seeks is a lease of the mineral estate in question through the competitive leasing process. At the hearing on defendants' motions, [Ash Creek's] counsel repeatedly referred to the investment which would be lost if this Court failed to reverse the Secretary's decision. Even if the Court were to grant the requested relief, the decision to offer the lands in question for competitive leasing would be in the sole discretion of the Secretary. MLA § 2(a), [30] U.S.C. § 201. Further, if the Secretary did decide to competitively lease the coal, there would be no guarantee that [Ash Creek] would be the successful bidder.

Dist.Ct. Order at 8. The court concluded that it could "fashion no order which would redress the injuries claimed by plaintiff; there is no 'substantial nexus between the relief requested and the elimination of the plaintiff's injury.'" Id. at 9 (quoting Glover River Org. v. United States Dep't of Interior, 675 F.2d 251, 255 (10th Cir.1982) (footnote omitted)).

The district court also determined that Ash Creek was collaterally estopped from relitigating the issue of standing because it had a "full opportunity to litigate the standing issue" in Ash Creek I. Id. Ash Creek subsequently filed this appeal.

### IV.

We immediately dispose of the district court's collateral estoppel rationale. Although in Ash Creek I the district court decided the standing issue adversely to Ash Creek, on appeal we affirmed the district court's judgment solely on the basis of ripeness and did not meet the standing question. Accordingly, in view of our pre-

vious decision on appeal, considerations of issue preclusion are not present here. We will meet the question of standing on the merits.

## V.

The vacillation of Ash Creek in its brief and at oral argument has not made our work easy. Throughout the district court proceedings, Ash Creek focused on the injury resulting from its inability to participate in the competitive leasing of the federal coal in question. In its complaint, Ash Creek averred that it "is specifically injured by the Defendants actions" because "[d]isposing of the federal coal by exchanges instead of by competitive leasing deprives ACMC the opportunity of providing fuel for the electrical needs of its customers served by the Central and South West System," and that "[i]t is necessary to acquire the federal coal to maintain the viability of the PSO No. 1 Mine" located immediately adjacent to the tract of federal coal lands at issue here. Complaint at 12–13. Ash Creek further alleged:

It is necessary to acquire the federal coal to expand the existing mine and fulfill the original purpose to serve the operating utilities of the Central and South West System. It is necessary to expand onto the federal coal so as to earn a return on the original investment in the PSO No. 1 Mine and the adjoining acreage.

*Id.* at 12.

Although the vagueness and lack of focus in Ash Creek's opening brief made it difficult for us to follow its argument, by the time it filed its reply to the federal appellees' brief, it seemed to have veered away from the major thrust of its complaint and opening brief. Instead of alleging an injury based on loss of an opportunity to participate in competitive leasing, it appeared to focus its argument on the negative impact of the exchange on the PSO No. 1 Mine and on the "[n]eeded environmental control facilities and reclamation facilities" housed on the 70 acres of surface land owned by Ash Creek that overlies the exchanged coal. Reply to Federal Appel-

lees' Brief at 3. Responding to questions at oral argument, Ash Creek's counsel explained:

We have claimed the injuries that we believe are necessary to preserve standing from the constitutional requirement. Our economic injuries under FLPMA arise by virtue of the Secretary's failure to consider the needs of state and local people and, in particular, Ash Creek Mining Co. in this matter. The abuse and the Secretary's omissions from compliance with this statutory mandate have resulted in interference with the appellant's lawful use of the surface and subjected needlessly the appellant's property to eminent domain. This action has resulted in a diminished value of the present property interest of appellant and severely limited the beneficial use of the present coal mine and the mine site improvements to Ash Creek Mining Co. and to others.

Transcript of Tape of Oral Argument (Mar. 9, 1992).

It bears repetition that the complaint's sole reference to this contention appears in only one of the 74 paragraphs in the complaint:

38. The exchanged coal lies beneath the SW¼ of Section 22 of ACMC's permitted minesite. The private ownership of the coal estate underlying the SW¼ of Section 22 diminishes the value of ACMC's investment by placing significant facilities necessary and essential to environmental protection, mining operation, and permit compliance at the PSO Mine No. 1 at the whelm of the development schedule of Defendants Consolidation Coal Company and Reserve Coal Properties Company. Hundreds of thousands of cubic yards of overburden that is stockpiled in the ACMC's PSO No. 1 Mine overlie the federal coal that is the subject of the JY Exchange. The mining of the exchanged coal under these surface facilities will adversely affect the operations of ACMC.

Complaint at 13.

We proceed, therefore, on the premise that Ash Creek is basing its standing con-

tention on two theories: (1) loss of an opportunity to participate in competitive leasing, as detailed in its opening brief at pages 16–20, and (2) impairment of its surface ownership.

### A.

■■ A detailed discussion is not necessary to dispose of the first contention. In its reply brief, Ash Creek acknowledged that

[h]ad ACMC sought a competitive coal lease, *Oklahoma Hospital Assoc.* [*v. Oklahoma Publishing Co.*, 748 F.2d 1421 (10th Cir.1984), *cert. denied*, 473 U.S. 905 (1985)] may have been applicable authority to deny standing. ACMC agrees that the lower court cannot order competitive leasing and that redressability is always an issue in determining a plaintiff's standing.

Reply to Federal Appellees' Brief at 4. We substantially agree with this statement and hold that had Ash Creek contended only the loss of the possibility of leasing the federal coal, it would have asserted an injury not redressable by a favorable decision and thus would have lacked Article III standing. *See Glover River*, 675 F.2d at 253–54.

### B.

■■ As to the second contention, we must decide whether the alleged damage caused by the exchange to Ash Creek's surface lands and mining operations is sufficient to confer Article III standing. Before we proceed to the merits of this argument, however, this must be said. An appellant bears the burden of persuading the reviewing court that the trial court has erred. This is accomplished by clear, consistent and coherent argument. An obfuscated argument before a judicial tribunal is seldom, if ever, effective. We acknowledge that a litigant may properly rely on alternative grounds for relief, but we feel that in this case, Ash Creek, with a dearth of clarity, substantially altered the focus of its argument both in its reply brief and at oral argument. This has made our analysis of its contentions extremely difficult.

### VI.

Article III of the Constitution limits the "judicial power" of federal courts to the resolution of "cases" and "controversies." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). One of the requirements of a "case" or "controversy" is that the plaintiff have "standing" to challenge the action sought to be adjudicated in the lawsuit. *Id.*

The Court has recently summarized the requirements for standing:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " *Whitmore* [*v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990)] (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 [103 S.Ct. 1660, 1665, 75 L.Ed.2d 675] (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42 [96 S.Ct. 1917, 1926, 48 L.Ed.2d 450] (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.*, at 38, 43 [96 S.Ct. at 1924].

The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence

required at the successive stages of the litigation.

*Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted) (footnote omitted).

Thus, as a constitutional minimum, "the plaintiff must allege some concrete injury, whether actual or threatened, and some chain of causation linking that injury to the challenged actions of the defendant." *Glover River,* 675 F.2d at 253 (footnote omitted). The plaintiff may not convert the federal courts into "publicly funded forums for the ventilation of public grievances." *Valley Forge,* 454 U.S. at 473, 102 S.Ct. at 759.

■ To establish "injury in fact," the plaintiff must show "a distinct and palpable injury to itself." *Glover River,* 675 F.2d at 254. An abstract injury is not enough; " '[t]he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' ' " *Id.* (quoting *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)). Although "[a]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court," *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984), courts generally will find injury in fact if the plaintiff can demonstrate a plausible benefit. In *Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981), for example, the Court held that the State of California had standing to challenge the Secretary of the Interior's failure to comply with a statute requiring it to experiment with different royalty systems in leasing offshore gas and oil production rights. Although a judgment would require the Secretary only to perform the experiments and would not guarantee the State any royalties, the Court determined that the State's loss of an opportunity for benefit constituted injury in fact. *Id.* at 160–62, 102 S.Ct. at 212–13.

■ To satisfy the "redressability" prong of the standing test, the plaintiff must demonstrate that a " 'substantial like-lihood' [exists] that the relief requested will redress the injury claimed." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978); *Glover River,* 675 F.2d at 254.

Although it is not entirely clear from its order in this case, the district court apparently based its finding of lack of standing on Ash Creek's failure to satisfy the redressability prong of the test. Recognizing that "what plaintiff seeks is a lease of the mineral estate in question through the competitive leasing process," the court held that it could "fashion no order which would redress the injuries claimed by plaintiff; there is no 'substantial nexus between the relief requested and the elimination of the plaintiff's injury.' " Dist. Ct. Order at 9. As observed by Professors Wright, Miller and Cooper, however, each of the three standing elements blends into the others:

> The very notion of injury implies a causal connection to the challenged activity; an injury caused by other events is irrelevant to any purpose of standing doctrine. Causation in turn bears on remedial benefit, since a remedy addressed to actions that have not caused the injury will not alleviate the injury.

C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531.4, at 418 (2d ed. 1984).

The appellees rely primarily on two cases from our court denying standing. In *Glover River,* the plaintiffs challenged the Secretary's listing of the leopard darter as an endangered species. They claimed that this listing precluded them from promoting a flood control project on an Oklahoma river. 675 F.2d at 252–53. The plaintiffs sought an injunction requiring the Secretary to prepare an environmental impact statement and an order staying the listing until the statement was completed. We held that the plaintiffs failed to meet the causation and redressability requirements for standing because "[e]ven if the preparation of [a statement] should lead to removal of the leopard darter from the threatened species list, this would not en-

sure the funding or construction of the projects" they desire. *Id.* at 255.

In *Oklahoma Hosp. Ass'n v. Oklahoma Publishing Co.,* 748 F.2d 1421 (10th Cir. 1984), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 652 (1985), a publishing company sought access to documents subject to protective orders entered in a separate action between the Oklahoma Hospital Association and the Oklahoma Department of Human Services. We explained that the publishing company lacked standing because its injuries might not be redressed by a favorable court ruling and explained that even if the protective orders were removed, the parties to the original lawsuit may exercise their discretion not to reveal those documents to the publishing company. *Id.* at 1425.

## VII.

We will now consider Ash Creek's contention that it has suffered an economic loss because, as stated in paragraph 38 of its complaint, the mining of the exchanged coal may adversely affect the operation of Ash Creek's PSO No. 1 Mine inasmuch as "[h]undreds of thousands of cubic yards of overburden that is stockpiled in the ACMC's PSO No. 1 Mine overlie the federal coal that is the subject of the JY Exchange." Complaint at 13.

We believe that this allegation does not confer Article III standing because no judicial action can redress the economic loss Ash Creek may sustain due to possible impediments in the operation of its PSO No. 1 Mine. Its contention borders on the ludicrous. Reduced to its essence, the argument is that inasmuch as Ash Creek owns the surface lands overlying a portion of the exchanged federal coal, owns the mining rights to adjacent lands and has already placed overburden from its PSO No. 1 Mine on the surface overlying part of the exchanged coal, the Department of the Interior is precluded *as a matter of law* from exchanging or leasing the subject coal to any other mining company in the world because such an exchange may require Ash Creek to change some of its present mining procedures.

To state this argument in these simple terms—devoid of the obfuscation and confusion set forth in Ash Creek's written and oral arguments—is to expose the futility, and fatality, of the argument. Ash Creek has not demonstrated a substantial nexus between the relief requested and the elimination of its injuries. No court can fashion an order redressing these alleged injuries because no court has the power to vest Ash Creek with mining rights to the exchanged coal lands or to prevent any other coal operator from possessing them.

Accordingly, because the injury must be " 'likely to be redressed by a favorable decision,' " *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)), we conclude that Ash Creek lacks Article III standing to maintain an action under the Mineral Leasing Act, Federal Land Policy Management Act, National Environmental Policy Act or Administrative Procedure Act. Having concluded that Ash Creek lacks Article III standing, we need not embark on a prudential standing analysis, which is required only after Article III standing has been established. *Id.* at 474–75, 102 S.Ct. at 759–60; *Oklahoma Hosp.,* 748 F.2d at 1424.

## VIII.

We conclude, therefore, that Ask Creek lacks Article III standing to pursue the claims alleged in its complaint. The judgment of the district court is

AFFIRMED.